# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **BRIT UW LIMITED** | § | **PLAINTIFF/** |
| | § | **COUNTER-DEFENDANT** |
| | § | |
| **v.** | § | **Civil No. 1:21-cv-280-HSO-RPM** |
| | § | |
| | § | |
| **D.S. LADNER HOLDINGS, LLC, and** | § | **DEFENDANTS/** |
| **DAS HOLDINGS LLC** | § | **COUNTERCLAIMANTS** |
| | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| **IAS CLAIM SERVICES** | § | **COUNTER-DEFENDANT** |

**MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF BRIT UW LIMITED'S MOTION [89] TO STRIKE THE DECLARATION [78-1] OF JOHN ROSETTI; DENYING DEFENDANTS D.S. LADNER HOLDINGS, LLC, AND DAS HOLDINGS LLC'S MOTION [74] FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF NOTICE; AND DENYING PLAINTIFF BRIT UW LIMITED'S MOTION [76] FOR SUMMARY JUDGMENT**

BEFORE THE COURT are Defendants D.S. Ladner Holdings, LLC and DAS

Holdings LLC's Motion [74] for Partial Summary Judgment on the Issue of Notice;

Plaintiff Brit UW Limited's Motion [76] for Summary Judgment;[1] and Plaintiff

UW Limited's Motion [89] to Strike the Declaration [78-1] of John Rosetti, which

---

[1] In response to Brit's Motion [76] for Summary Judgment and in support of their own Motion [74], Defendants D.S. Ladner Holdings, LLC and DAS Holdings LLC's request oral argument. *See* Mot. [74] at 1 (citing L.U. Civ. R. 7(b)(6)(A)); Resp. [78] at 1 (same). They do not articulate or attempt to explain how oral argument would be beneficial. *See* Mot. [74] at 1 (citing L.U. Civ. R. 7(b)(6)(A)); Resp. [78] at 1 (same). Given the thoroughness of the parties' briefs and the nature of the issues raised, the Court finds that oral argument would not be helpful. Defendants D.S. Ladner Holdings, LLC and DAS Holdings LLC's request should be denied.

Defendants D.S. Ladner Holdings, LLC and DAS Holdings LLC submitted in support of their Response [78] to Plaintiff's Motion [76] for Summary Judgment.

After consideration of the record in this case and relevant legal authority, the Court finds that Plaintiff Brit UW Limited's Motion [89] to Strike should be granted, that Defendants D.S. Ladner Holdings, LLC and DAS Holdings LLC's Motion [82] for Partial Summary Judgment should be denied, and that Brit's Motion [74] for Summary Judgment should be denied.

## I.   BACKGROUND

### A.   Factual background

Defendants/Counterclaimants D.S. Ladner Holdings, LLC and DAS Holdings LLC (collectively, the "Ladner LLCs" or "Ladner") own real estate holdings consisting of "over two hundred (200) doors located in the Gulfport, Mississippi area," including both "single residential units" and "multi-residential units."   Decl. [74-1] at 1 (Declaration of the Ladner LLCs' managing member Steven Ladner). On November 17, 2019, the Ladner LLCs purchased two real estate owned asset protection insurance policies (the "Policies") for their real estate portfolio through the Lloyd's of London insurance market.   *See id.*; Policy [1-2]; Policy [1-3].   One Policy [1-2] only secured non-flood risks, *see* Policy [1-2], while the other included an "REI FLOOD ENDORSEMENT" and "insure[d] losses resulting from the peril of FLOOD," Policy [1-3] at 4.   Plaintiff Brit UW Limited ("Plaintiff" or "Brit") was a subscriber to both Policies.   *See* Compl. [1]; Policy [1-2]; Policy [1-3].

The Policies "cover[ed] all property and/or interest at risk as of 12:01 AM

2

(Standard Time at place of issuance) on 11/17/2019 and continue[d] in force until 12:01 AM (Standard Time at place of issuance) on 11/17/2020." Policy [1-2] at 8; Policy [1-3] at 10. According to Brit, "the Policies do not provide coverage for any specific property, but only provide coverage for properties that Ladner reported and paid premiums for on a monthly basis." Mem. [77] at 2-3. Under the Policies, the Ladner LLCs were "required to report to Underwriters, on or before the tenth (10th) day of each month, a complete transaction report including the full replacement cost of each property to be insured," and premiums were calculated and paid each month. Policy [1-2] at 8 (emphasis removed); Policy [1-3] at 10 (emphasis removed). The Ladner LLC's Memorandum explains that this allows "the flexibility to add and delete properties as they are bought and sold" and allows premiums to fluctuate, "resulting in a lower overall average cost." Mem. [79] at 8.

In order to advise of loss or damage to property, the Policies each contained a notice provision which stated as follows:

**NOTICE OF LOSS, DUTIES AND RESPONSIBILITIES**

The Assured shall immediately report in writing, to the Underwriters, a description of every claimed loss or damage which occurs and may become a claim under this insurance immediately after it becomes known to the Assured. You may make a claim for loss or damage covered under this policy/certificate if you notify Underwriters, but in no case, later [sic] than 30 days following the date of loss or damage.

Policy [1-2] at 19 (emphasis in original); Policy [1-3] at 21 (emphasis in original).

During the Policy period, on October 28 and 29, 2020, Hurricane Zeta struck the Gulfport, Mississippi, area causing heavy rains, storm surge, and strong winds, resulting in damages to the Ladner LLCs' properties. *See* Decl. [74-1] at 1-2. The

Ladner LLCs' managing member, Steven Ladner ("Mr. Ladner"), purportedly began to visit its insured properties immediately after the storm "to make an assessment of the most visibly damaged locations." *Id.* at 2. According to Mr. Ladner, beginning on or around November 2, 2020, he "continually reported damage" to the properties to the Ladner LLCs' insurance agent to the extent Mr. Ladner was able to access them because of downed trees and power lines, and the insurance agent began reporting claims to the insurer. *Id.*

Brit assigned the formal claims handling process to IAS Claim Services ("IAS"), which in turn hired field adjuster Lucas McCoy ("Mr. McCoy"). *Id.* Mr. Ladner believed that Mr. McCoy's repair cost estimates were very low, and "between December 2020 and January 2021, [Mr. Ladner] asked a contractor named Chuck Vance to review Mr. McCoy's inspection reports." *Id.* Mr. Vance determined that the property damage was "grossly undervalued." *Id.* Mr. Ladner requested that Mr. McCoy reinspect the properties, and Mr. Vance accompanied Mr. McCoy during those visits. *Id.* According to Mr. Ladner, "[u]pon reinspection, the estimated damage calculations more than quadrupled and, as to some properties, the Ladner LLCs received supplemental actual cash value ('ACV') payments for some previously-inspected properties that had been off by tens of thousands of dollars." *Id.* at 2-3.

Ms. Ladner's Declaration states that Mr. McCoy's schedule only permitted him to inspect the Ladner LLCs' properties on certain days and that Mr. McCoy could only visit two or three houses per day. Mr. Ladner avers that "[d]amages

relating to specific location losses would be reported in groups as Mr. McCoy was able to access the properties and complete his field reports," and that this reporting processing, which was "the product of Mr. McCoy's schedule," was approved by the Ladner LLCs, Mr. McCoy, and IAS.  *Id.*  Mr. Ladner has identified six properties as "examples of location losses that, with the approval of IAS, were reported after the Policies expired, reported outside of the thirty (30) day reporting periods, adjusted by IAS, and paid by Certain Underwriters at Lloyd's, London," and he states that "[a]pproximately twenty-six (26) location losses were resolved with little issue." *Id.* However, when the Ladner LLCs "began to submit higher value claims," Mr. Ladner states that "valuation began to be questioned," and "[i]t was at this point that IAS changed its position on coverage." *Id.*  Additional losses were denied by Brit as outside of the Policies' 30-day reporting period. *Id.* at 4.

B.   Procedural history

On August 26, 2021, Brit filed a Complaint [1] against the Ladner LLCs in this Court seeking a declaration regarding its coverage obligations for damages the Ladner LLCs' properties sustained during Hurricane Zeta.  *See* Compl. [1].  Brit alleges that, while the Ladner LLCs submitted 23 timely property damage claims in compliance with the Policies' 30-day notice provision, they made 88 late-reported claims, and they purportedly "continue[ ] to late report additional claims for property damage in breach of the Policies' clear and unambiguous language." *Id.* at 8-9.  The Complaint seeks declarations that the Ladner LLCs failed to comply with the Policies' notice provisions, that Brit has been prejudiced by the Ladner LLCs'

failure to comply, that Brit owes no obligation to the Ladner LLCs, and that the Ladner LLCs' "material breach of the Policies warrants a denial of coverage for any claims late reported after November 27, 2020, or more than 30 days following the October 28, 2020 date of loss." *Id.* at 10.

The Ladner LLCs filed an Answer [13] to the Complaint [1], followed by an Amended Answer and a Counterclaim [41] against Brit, which added IAS Claims Services ("IAS") as a Counter-Defendant.[2]  *See* Am. Countercl. [41].  The Ladner LLCs advance claims against Brit for bad faith breach of contract, breach of the duty of faith and fair dealing, equitable estoppel, and respondeat superior, *see id.* at 10-12, and claims against IAS for "grossly negligent adjusting of claim," and "grossly negligent misrepresentation," *id.* at 12-16.  The Ladner LLCs also raised a "respondeat superior" claim against IAS, *id.* at 16, which the Court dismissed upon IAS's Motion [83] because it is not an independent cause of action, *see* Order [100] at 12-13.

The Ladner LLCs have filed a Motion [74] for Partial Summary Judgment on the Issue of Notice.  *See* Mot. [74].  They state that their Motion [74] "centers around the legal question of whether the 30 day notice provision is a triggering condition of coverage or is a condition that could be waived, and/or entitles the Ladner LLCs to argue estoppel, and/or would require Brit to prove prejudice due to

---

[2]  IAS is not a plaintiff but is only named as a "Counter-Defendant" in the Ladner LLC's Amended Counterclaim.  *See* Compl. [1]; Am. Countercl. [41]; *see also* Order [38] (Magistrate Judge's Order characterizing the Ladner LLCs' earlier Motion [21] for Leave to File a Third-Party Complaint [23] against IAS as a request to assert counterclaims against IAS as a Counter-Defendant).

any delay." *Id.* at 2.  The Ladner LLCs take the position that "[t]he 30 day notice provision is a condition subsequent to coverage, i.e. a forfeiture provision, and the Ladner LLCs are entitled to partial summary judgment." *Id.*

Brit has filed its own Motion [76] for Summary Judgment on its main declaratory judgment claim "on the limited issue of whether Brit's Policies provide coverage for claims reported by the Defendants more than 30 days after Hurricane Zeta, the reported dated of loss." Mot. [76] at 1.  Brit asks that "the Court grant summary judgment that Ladner is not entitled to coverage and policy proceeds for any claim made more than 30 days after the date of loss or damage to any specific property insured." *Id.* at 2.

## II.  DISCUSSION

### A.    Summary judgment standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quotation omitted).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Nat'l Liab. & Fire Ins. Co. v. Riata Cattle Co., Inc.*, 55 F.4th 1041, 1043 (5th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When a movant also

carries the burden of proof at trial, such as when he seeks summary judgment on his own claim or affirmative defense, this burden is higher; he must "establish beyond peradventure *all* of the essential elements of the claim or defense." *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (emphasis in original) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).

On cross-motions for summary judgment, a court reviews each party's motion independently.  *See Bitco Gen. Ins. Corp. v. Monroe Guar. Ins. Co.*, 31 F.4th 325, 329 (5th Cir. 2022).  In reviewing the entire record, a court considers the evidence in a light most favorable to each nonmovant and draws all reasonable inferences in its favor.  *See id.*; *Pioneer Expl., L.L.C.*, 767 F.3d at 511.

B.   <u>Applicable substantive law</u>

As the parties agree, in a diversity case such as this one, the Policies must be interpreted according to the substantive law of the forum, Mississippi.  *See, e.g.,* Mem. [75] at 7; Mem. [77] at 5-6; *McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.*, 736 F.3d 375, 377 (5th Cir. 2013); *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004).  Mississippi courts treat insurance policies as contracts and interpret them the same as other contracts.  *See Hayne v. The Drs. Co.*, 145 So. 3d 1175, 1180 (Miss. 2014).

When the words of an insurance policy are plain and unambiguous, they are afforded their "plain, ordinary meaning" and will be applied "as written" based solely upon the four corners of the document.  *Noxubee Cnty. Sch. Dist. v. United Nat. Ins. Co.,* 883 So. 2d 1159, 1165 (Miss. 2004) (quotation omitted); *see Hillhouse*

*v. Chris Cook Constr., LLC*, 325 So. 3d 646, 652 (Miss. 2021).   A court "should look at the policy as a whole, consider all relevant portions together and, whenever possible, give operative effect to every provision in order to reach a reasonable overall result." *Minnesota Life Ins. Co. v. Columbia Cas. Co.*, 164 So. 3d 954, 968 (Miss. 2014) (quotation omitted).

A court may not "resort to extrinsic evidence or rules of contract construction if policy provisions are unambiguous" and may not "make a contract differing from that made by the parties themselves" or "enlarge an insurance company's obligations where the provisions of its policy are clear." *Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 429 (5th Cir. 2007) (quotation omitted).   In reviewing an unambiguous contract, a court focuses "upon the objective fact—the language of the contract"—and is "concerned with what the contracting parties have said to each other, not some secret thought of one not communicated to the other." *Hillhouse*, 325 So. 3d at 652 (emphasis removed) (quotations omitted).

The question of whether a policy is ambiguous is one of law.  *See Leonard*, 499 F.3d at 429 (citing *Benchmark Health Care Ctr., Inc. v. Cain*, 912 So. 2d 175, 182 (Miss. 2005)); *see also Noxubee Cnty. Sch. Dist.*, 883 So. 2d at 1165 ("The interpretation of an insurance policy is a question of law, not one of fact."). Ambiguity "arises when a term or provision is susceptible to more than one reasonable meaning," or if there is an "internal conflict" in a policy's provisions, which "renders uncertain the meaning of the policy as a whole."  *Leonard*, 499 F.3d at 429 (quotation omitted).

"[A]mbiguous and unclear policy language must be resolved in favor of the non-drafting party—the insured," and "provisions that limit or exclude coverage are to be construed liberally in favor of the insured and most strongly against the insurer." *Noxubee Cnty. Sch. Dist.,* 883 So. 2d at 1165; *see also Leonard*, 499 F.3d at 429 (holding that, if a court finds a policy provision is ambiguous, it "must then select the interpretation which gives the greater indemnity to the insured"). The Mississippi Supreme Court has explained that the basic reason for this "is that the insurer prepares the policy and should not be allowed by the use of obscure or ambiguous exceptions to defeat the purposes for which the policy was sold." *Com. Union Ins. Co. v. Dairyland Ins. Co.*, 584 So. 2d 405, 408 (Miss. 1991) (quotation omitted). Nonetheless, "[t]he mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law." *Watkins & Eager, PLLC v. Lawrence*, 326 So. 3d 988, 992 (Miss. 2021) (quotation omitted).

C.    Analysis

1.    Brit's Motion [89] to Strike

In opposition to Brit's Motion [76] for Summary Judgment, the Ladner LLCs have submitted the Declaration [78-1] of insurance agent John Rosetti ("Rosetti"). *See* Decl. [78-1]. Brit asks the Court to strike Rosetti's Declaration, arguing that his opinions are inadmissible and irrelevant to the Court's interpretation of the Ladner LLC's Policies. *See* Mem. [90] at 1, 4-6 (citing Fed. R. Civ. P. 56(e)). Brit states that the Ladner LLCs have not proffered Rosetti as an expert and that interpretation of

10

the Policies is a question of law for the Court, rendering the Declaration irrelevant. *Id.* at 4.

The Ladner LLCs respond that they "do not dispute [the] principle of the law" that "[i]nterpretation of an insurance contract is for the Court and any opinion by an expert that encroaches on the Court's authority should be stricken." Resp. [95] at 1. But they maintain that Rosetti's Declaration does not do so. *See id.* They contend that Rosetti is both a fact witness and a non-retained expert witness with specialized knowledge of the Lloyd's insurance market who need not be designated or prepare a formal written report, and that Rosetti has not yet been designated because there has been no case management order entered setting an expert designation deadline. *See id.* at 2-3 (citing Fed. R. Evid. 702(a); L.U. Civ. R. 26(a)(2)). The Ladner LLCs insist that insurance witnesses like Rosetti are allowed to testify regarding the customs and standards of claims adjusting and that the Declaration is admissible in its entirety. *See id.* at 3-10.

A declaration used to support a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Only relevant evidence is admissible. *See* Fed. R. Evid. 402.

Rosetti relates his background and experience in the insurance agency and with the Ladner LLCs and Lloyd's, particularly Lloyd's Real Estate Investors ("REI") property market coverage program. *See* Decl. [78-1] at 1-2. Rosetti also details how he secured coverage for the Ladner LLCs and his experience with

"claims-made" and "claims-made and reported" policies, *see* Decl. [78-1] at 2-3,

which is an issue raised by Brit, *see* Mem. [7] at 9-11.  Rosetti also states that the

Ladner LLCs did not apply for, and that he did not secure, "claims-made" or

"claims-made and reported" policies.  Decl. [78-1] at 3.   According to Rosetti, he was

also involved in the reporting of the Ladner LLCs' claims, and he avers that "Lloyd's

routinely chooses not to enforce these types of reporting provisions after a large

catastrophic loss because they become impractical," and that the 30-day reporting

provision in the Ladner LLCs' Policies were purportedly not enforced, but that

"[e]ventually, Lloyd's stopped paying the Ladner LLC's claims." *Id.* at 2-4.

For purposes of resolving the present summary judgment Motions [74], [76],

the issue before the Court is interpretation of the Policies' notice provisions, which

is a question of law.  *See Noxubee Cnty. Sch. Dist.,* 883 So. 2d at 1165.  Rosetti's

background, how he procured the Policies, what coverage he could have procured,

intended to procure, or believed he procured for the Ladner LLCs, and how other

Lloyd's underwriters may have adjusted claims on different policies unrelated to

this case are not issues before the Court, making those portions of the Declaration

irrelevant to summary judgment.  *See* Decl. [78-1]; Fed. R. Evid. 401.  Because only

relevant evidence is admissible, *see* Fed. R. Evid. 402, the Motion [89] to Strike

should be granted, and the Declaration will not be considered.

2.     The parties' summary judgment Motions [74], [76]

The parties have filed competing Motions [74], [76] for Summary Judgment,

each arguing about the issue of the timeliness of the Ladner LLCs' notices of loss as

12

to some of their property damage claims.  *See* Mot. [74]; Mot. [76]; Compl. [1].  Brit seeks summary judgment that the Ladner LLCs are "not entitled to coverage and policy proceeds for any claim made more than 30 days after the date of loss or damage to any specific property insured."  Mot. [76] at 3.   In contrast to the clear-cut, blanket-noncoverage ruling sought by Brit, the Ladner LLCs argue that the 30-day notice provision is what is known as a "condition subsequent to coverage, i.e. a forfeiture provision," and that this "is a condition that could be waived, and/or entitles the Ladner LLCs to argue estoppel, and/or would require Brit to prove prejudice due to any delay."  Mot. [74] at 2.  The Ladner LLCs insist that "this Court should find that the case should go forward to trial on the issues of waiver, estoppel, and/or prejudice."  Mem. [75] at 18.   In substance, the Ladner LLCs are arguing the converse of Brit's Motion [76] for Summary Judgment.

     a.   <u>Relevant Policy provisions</u>

     As stated previously, the Policies' "NOTICE OF LOSS, DUTIES AND RESPONSIBILITIES" provisions both state that the Assured, meaning the Ladner LLCs,

> shall immediately report in writing, to the Underwriters, a description of every claimed loss or damage which occurs and may become a claim under this insurance immediately after it becomes known to the Assured.  You may make a claim for loss or damage covered under this policy/certificate if you notify Underwriters, but in no case, later [sic] than 30 days following the date of loss or damage.

Policy [1-2] at 19; Policy [1-3] at 21.  The sections of the Policies concerning deductibles state that "[a]ll claims for loss damage or expense arising out of any occurrence shall be *adjusted separately for each reported location*, and from the

13

amount of such adjusted claim the following shall be deducted . . . ."  Policy [1-2] at

9 (emphasis added); Policy [1-3] at 11 (emphasis added).   Later, the Policies provide

that

> [i]f a breach of any warranty, duty, application, representation, responsibility, report or condition in any form or endorsement attached to or made a part of this insurance shall occur, such breach, by the term of such warranty, duty or condition, *shall operate to void this insurance*. It is agreed that such suspension or voidance due to such breach shall be effective only during the continuance of such breach, and then only as to the building or contents therein or other separate locations to which such warranty or condition has reference and as respects to which such breach occurs.

Policy [1-2] at 18 (emphasis added); Policy [1-3] at 20 (emphasis added).

b.   <u>Whether the notice provision is clear and unambiguous</u>

The Court's initial focus must be to apply the basic tenets of contract

interpretation.  *See Noxubee Cnty. Sch. Dist.*, 883 So. 2d at 1165.  Clear and

unambiguous words are accorded their "plain, ordinary meaning" and must be

applied as written based solely upon the four corners of the document.   *Id.*

According to the Policies' identical notice provisions at issue here,

> [t]he Assured shall *immediately report* in writing, to the Underwriters, a description of every claimed loss or damage which occurs and may become a claim under this insurance *immediately after it becomes known to the Assured*.  You may make a claim for loss or damage covered under this policy/certificate *if you notify Underwriters*, but in *no case, later [sic] than 30 days* following the date of loss or damage.

Policy [1-2] at 19 (emphasis added); Policy [1-3] at 21 (emphasis added).[3]  Having

---

[3] There appears to be at least one word missing from the second sentence of the Policies' notice provisions, and with the phrase "but in no case" set off by commas, the second sentence is grammatically incorrect.   Policy [1-2] at 19; Policy [1-3] at 21.  However, this does not change the intent of the provision because the Court concludes that there is only

reviewed the Policies as a whole, the Court finds that this notice provision required the Ladner LLCs to "immediately report" every claimed loss or damage "immediately after it becomes known" to the Ladner LLCs, with the clarification or qualifier by the second sentence that the Ladner LLCs must "notify Underwriters" no later than "30 days following the date of loss or damage." Policy [1-2] at 19; Policy [1-3] at 21. A plain reading of this provision indicates that the 30-day time limit operates to modify or elaborate on what the Policies mean by their use of the term "immediately." Policy [1-2] at 19; Policy [1-3] at 21. In other words, for properties that sustained damage on October 28, 2020, the Ladner LLCs had to report a loss to Underwriters immediately, but in no case later than 30 days after the date of loss, which would have been November 27, 2020.[4]

      c.   <u>Whether the Policies should be read as akin to "claims-made and reported" policies</u>

The heart of this dispute is whether the Ladner LLCs failed to notify Underwriters within 30 days of Hurricane Zeta with respect to loss or damage to one or more of its covered properties and whether that failure absolves Brit of any coverage obligations. The parties disagree whether the 30-day notice provisions mean that the Policies should be interpreted the same as a "claims-made and reported" policy, such that it is an "essential term" of the insurance, Mem. [77] at

---

one reasonable interpretation of the notice provision.

[4] According to Mr. Ladner's Declaration, Hurricane Zeta made landfall "October 28-29, 2020." Decl. [74-1] at 1. Brit focuses on October 28 and states that "Ladner was required to make a claim in writing for its purported Hurricane Zeta loss or damage to any particular property by November 27, 2020." Mem. [77] at 8. This assumes that all of the properties were damaged on October 28, and not the 29th, but that issue need not be resolved now.

10; whether compliance with the provision is a "condition precedent" to coverage, *id.* at 11-12; or whether compliance is a "condition subsequent to coverage, i.e. a forfeiture provision that Brit waived or is estopped from asserting, and/or that would require Brit to prove prejudice due to the delay," Mem. [75] at 7.  Brit and the Ladner LLCs spend much time in their briefs comparing and contrasting the Policies to other policies that have been interpreted by Mississippi courts and the Fifth Circuit, but they appear to agree that there is no controlling authority interpreting the precise provisions at issue here.  *See, e.g.,* Mem. [77] at 9.

Brit states that "this is not a typical insurance contract" and acknowledges that it has "found no Mississippi authority interpreting a similar 30-day claims-made provision in an asset protection policy where the insured self-reports properties."  *Id.*   Brit insists that the Policies must be interpreted differently than typical "occurrence" policies and should instead be treated like claims-made and reported policies.  *Id.* at 9-11.  It cites a case from this District finding that, in "an insurance policy requiring both the claim to be made <u>and</u> reported during the policy period, the insured's reporting the claim within the prescribed period was an ***'essential term'*** to coverage."  *Id.* at 10 (emphasis in original) (citing *Sollek v. Westport Ins. Corp.*, No. 3:12CV115-DPJ-FKB, 2012 WL 5835535, at *4 (S.D. Miss. Nov. 2, 2012)).   Brit reasons that the 30-day notice provision in the Ladner LLC's Policies was an essential term, *see id.* at 10-11, and "[w]here Ladner did not report damage to any specific reported property within 30 days of Hurricane Zeta (i.e. by November 27, 2020), there is no coverage for that property for an alleged loss

16

caused by that hurricane," *id.* at 11.

Central to Brit's argument is a basic understanding of the different types of insurances policies potentially relevant here. "A 'claims made' policy protects the holder only against claims made during the life of the policy, while an 'occurrence' policy protects the policyholder from liability for any act done while the policy is in effect." *Minnesota Life Ins. Co.*, 164 So. 3d at 968 (quotation omitted) (discussing professional liability insurance policies); *see Sollek*, 2012 WL 5835535, at *3. For a claims-made policy, an insured is protected against claims made against it during the policy period, regardless of when the insured act or occurrence of loss itself took place. *See Minnesota Life Ins. Co.*, 164 So. 3d at 968; *Sollek*, 2012 WL 5835535, at *3. By contrast, the date of the covered act or loss occurrence is the focus of occurrence policies, which "will cover all wrongful acts which occurred during the term of the policy even if a claim is made after expiration of the policy if the wrongful act took place while such policy was in effect." *Minnesota Life Ins. Co.*, 164 So. 3d at 968 (emphasis removed) (quotations omitted); *see also Sollek*, 2012 WL 5835535, at *3 (stating that an occurrence policy "protects the policy holder from liability for any act done while the policy is in effect" (quotation omitted)).

Similar to a claims-made policy, under a "claims-made and reported policy," an insured is only protected against claims made against it during the policy period, but it "also requires that the claim be reported to the insurance company within the policy period." *Sollek*, 2012 WL 5835535, at *3 (quotation omitted); *see also Jones v. Lexington Manor Nursing Ctr., L.L.C.*, 480 F. Supp. 2d 865, 868 (S.D. Miss. 2006)

17

(stating that the "true mark of a 'claims made' [policy] is that it provides coverage for any claim first asserted against the insured during the policy period, regardless of when the incident giving rise to the claim occurred. Whether reporting to the insurer [is] also a condition of coverage depends on the terms of the specific policy."). In other words, while both claims-made and claims-made and reported policies cover claims made within the policy period, regardless of when they arose, the latter has the additional requirement that the claim must also be "reported to the insurance company within the policy period." *Jones*, 480 F. Supp. 2d at 868.

Brit does not contend that the Policies here are actually claims-made or claims-made and reported policies; instead, it posits that "in order to give the parties the benefit of their bargain," Mem. [77] at 9, the 30-day notice provisions in the Policies should be construed as "*akin* to a claims made and reported policies," Rebuttal [91] at 11 (emphasis added); Mem. [92] at 11 (same). One problem with this reasoning is that claims-made and claims-made and reported policies typically involve third-party or professional liability coverage—the types of policies where the insured receives a claim from a third party and then in turn reports that claim to its insurance company. *See Minnesota Life Ins. Co.*, 164 So. 3d at 958; *Sollek*, 2012 WL 5835535, at *1; *Jones*, 480 F. Supp. 2d at 866. That is plainly not the scenario here. The "claims" at issue in claims-made and claims-made and reported policies are those submitted by third parties against an insured, not property loss claims submitted by the insured itself to the insurer, as in this case.[5] *See Minnesota Life*

---

[5] The Policies have a separate Commercial General Liability Coverage Form, covering

*Ins. Co.*, 164 So. 3d at 958; *Sollek*, 2012 WL 5835535, at *3; *Jones*, 480 F. Supp. 2d at 866. Given these clear distinctions, Brit has not shown how its arguments concerning these distinct types of policies support its summary judgment request. Indeed, a plain reading of the Policies reflects that, at least as to the Ladner LLCs' property damage claims, these were essentially occurrence policies. *See* Policy [1-2]; Policy [1-3]; *Minnesota Life Ins. Co.*, 164 So. 3d at 968; *Sollek*, 2012 WL 5835535, at *3.

A further review of the Policies supports this conclusion. Each Policy "covers all property and/or interest at risk as of 12:01 AM (Standard Time at place of issuance) on 11/17/2019 and continues in force until 12:01 AM (Standard Time at place of issuance) on 11/17/2020." Policy [1-2] at 8; Policy [1-3] at 10. The Ladner LLCs were "required to report to Underwriters, on or before the tenth (10th) day of each month, a complete transaction report including the full replacement cost of each property to be insured," and premiums were calculated and paid each month. Policy [1-2] at 8 (emphasis removed); Policy [1-3] at 10 (emphasis removed). The plain meaning of this provision is that this requirement, if met, triggers coverage for those properties. *See* Policy [1-2] at 8; Policy [1-3] at 10. The Ladner LLCs then must "immediately report in writing, to the Underwriters, a description of every claimed loss or damage which *occurs* and may become a claim under this insurance immediately after it becomes known," and they "may make a claim for loss or

_____

bodily injury and property damage liability, which is not at issue here. *See* Policy [1-2] at 27; Policy [1-3] at 29.

damage covered under this policy/certificate if [the Ladner LLCs] notify Underwriters, but in no case, later [sic] than 30 days following the date of loss or damage."  Policy [1-2] at 19 (emphasis added); Policy [1-3] at 21 (emphasis added).

While the Policies anticipate that the properties covered and the premium charged may change month-to-month over the course of the one-year Policy period, Brit cites no provision indicating that the loss could have occurred at any point in time, even if prior to the term of the Policy, distinguishing it from a typical "claims-made and reported" policy.  *See id.* at 10, 21; *but see Minnesota Life Ins. Co.*, 164 So. 3d at 968; *Sollek*, 2012 WL 5835535, at *3.  Nor has Brit argued that any Policy provision states that a claim must be reported to Underwriters before the expiration of the one-year Policy period in order to be covered, as required by claims-made and reported policies.  *See* Mem. [77]; *but see Sollek*, 2012 WL 5835535, at *3; *Jones*, 480 F. Supp. 2d at 866.  Brit's arguments that the Policies should be read as "akin" to a typical "claims-made and reported" policy, and its reliance upon caselaw interpreting the latter, are unpersuasive.  *See* Mem. [77] at 9-11; Rebuttal [91] at 11-12; Mem. [92] at 10-13.

      d.    <u>Whether the 30-day notice provision was a "condition precedent" to coverage</u>

Brit next contends that, to the extent the Court should find that the 30-day notice provision constituted a condition precedent, it need not show prejudice in order to avoid its obligations under the Policies.  *See* Mem. [77] at 12; Mem. [92] at

10-15.[6]   To the extent the notice provision does not qualify as a condition precedent, Brit argues in the alternative that the Ladner LLCs' "conduct in late reporting claims outside the express 30-day window breaches an obligation that voids coverage under the express terms of the Policies."   Mem. [77] at 14.   It insists that the Policies "bar coverage for claims to any scheduled property reported more than 30 days after October 28, 2020, the alleged date of loss."   *Id.*

The Ladner LLCs argue that the Policies do not contain the express language that would be required to read the 30-day notice provision as a condition precedent to coverage, and as such the provision could be waived or forfeited, and that this is what occurred based upon the conduct of IAS as Brit's adjuster.   *See* Mem. [75] at 15-17; Mem. [79] at 18-20.   The Ladner LLCs take the position that Brit's argument on this point demonstrates that the notice provision is a "condition subsequent" to coverage, which means it could be forfeited.   *See* Mem. [75] at 17-19; Mem. [79] at 20-21.   They reason that avoidance of liability under a forfeiture provision such as this would require Brit to show that it was prejudiced by any late notice before it could avoid coverage, making summary judgment inappropriate.   *See* Mem. [75] at 17-20; Mem. [79] at 20-26.

Brit replies that it need not show prejudice because the Ladner LLCs' "conduct in late reporting claims outside the express 30-day window voids coverage under the express terms of the Policies."   Rebuttal [91] at 14.   Brit maintains that

---

[6]  One of the declarations Brit seeks in the Complaint [1] is that it "has been prejudiced by the Assured's failure to comply with its duties under the Policy."   Compl. [1] at 10.

the notice provision was a "contractual covenant of the insured" and "part of the insuring agreement itself." *Id.* (quoting *Sollek*, 2012 WL 5835535, at *6); *see* Mem. [92] at 13-15.  In their Rebuttal [99], the Ladner LLCs point out that Mississippi authority requires insurers to draft a policy clearly in order to establish notice as a condition precedent to coverage, but that the Policies here simply do not do so.  *See* Rebuttal [99] at 11-12.

> The Mississippi Supreme Court has explained that
>
> [w]here a contract of insurance requires as a condition precedent to insurer's liability, that notice be given to the insurer within "a reasonable time" or "as soon as practicable" after an accident, . . . such notice must have been given by the insured, or someone in his behalf, within the time agreed upon, unless there is a reasonable excuse offered by or for the insured, for his failure so to do.

*Harris v. Am. Motorist Ins. Co.*, 126 So. 2d 870, 873 (Miss. 1961).  If an insured does not comply with a notice provision that constitutes a condition precedent to coverage, the insurer is not required to show prejudice in order to deny a claim. *See U.S. Fid. & Guar. Co. v. Wigginton*, 964 F.2d 487, 490 (5th Cir. 1992) ("A substantial line of cases supports the rule that an insurer need not show prejudice when the insured breaches a condition precedent or a condition that voids the policy." (collecting cases)).

However, "insurers who wish to make notice a condition precedent must do so clearly." *Cap. City Ins. Co. v. Ringgold Timber Co.*, 898 So. 2d 680, 682 (Miss. Ct. App. 2004) (citing *Com. Union Ins. Co. v. Dairyland Ins. Co.*, 584 So. 2d 405, 408 (Miss. 1991)).  The Mississippi Supreme Court held in *Dairyland* that, even though the policy required the insured to send notice "promptly," its failure to

unambiguously state that a lack of notice would render any obligations under the police void was not sufficient to establish such notice as a condition precedent to coverage.  *See Dairyland Ins. Co.*, 584 So. 2d at 407-08.[7]

Central to Brit's argument is that many of the policies in Mississippi with notice provisions that have been found not to be conditions precedent do not list a specific number of days within which notice must be provided.  *See, e.g.,* Mem. [77] at 13 ("Here, unlike general notice provisions in liability policies, the Policies only permit Ladner to make a claim for loss or damage, if such loss or damage is reported within 30 days of the date of loss or damage.").  The Court is not persuaded that the four corners of either Policy support a conclusion that the notice provision constituted a condition precedent that would, if not met, automatically absolve Brit of any coverage obligations.  *See* Policy [1-2] at 19; Policy [1-3] at 21.   First, the Policies do not clearly state that failure to comply with the notice provisions would absolve Brit of coverage without any showing of prejudice.  *See Cap. City Ins. Co.*, 898 So. 2d at 682; *Dairyland Ins. Co.*, 584 So. 2d at 407-08.  And, as the Court will discuss, language elsewhere in the Policies further counsel against such a conclusion.

Brit relies upon the identical breach of warranty provisions in the Policies, which state that

---

[7] The *Dairyland* policy ambiguously stated that the insurer "may have the right to refuse [the insured] any further protection" if prompt notice was not received, implying that the insured also "may not have the right to refuse protection."  *Dairyland Ins. Co.*, 584 So. 2d at 408.  The Mississippi Supreme Court construed this ambiguity in favor of the insured.  *See id.*

> [i]f a breach of any warranty, duty, application, representation, responsibility, report or condition in any form or endorsement attached to or made a part of this insurance shall occur, such breach, by the term of such warranty, duty or condition, *shall operate to void this insurance.* It is agreed that such suspension or voidance due to such breach shall be effective only during the continuance of such breach, and then only as to the building or contents therein or other separate locations to which such warranty or condition has reference and as respects to which such breach occurs.

Policy [1-2] at 18 (emphasis added); Policy [1-3] at 20 (emphasis added).

"A contract that is conditioned to become void on a specified event is one subject to a condition subsequent." *Cap. City Ins. Co.*, 898 So. 2d at 682. In *Capital City*, the Mississippi Court of Appeals held that where coverage is granted in one section of a policy, but can be defeated by a later lack of notice, the notice provision operates as a condition subsequent to coverage. *See id.* Under those circumstances, an insurer must demonstrate that it suffered prejudice based upon the lack of notice before it can deny coverage, and prejudice is a question of fact. *See id.*

When read as a whole, the Policies here contain similar forfeiture language— that coverage granted by one provision can become void if there is a subsequent lack of timely notice. *See id.*; *see also, e.g.,* Policy [1-2] at 1 (Declaration Page); *id.* at 10 (stating in Property Covered provision that the Ladner LLCs "shall be indemnified" for loss "by reason of all covered perils resulting in direct physical loss or damage to and property described and scheduled under this policy"); *id.* at 19 (including the 30-day loss or damage notice provision in Policy Conditions); *id.* at 18 (stating that a breach of any condition "*shall operate* to void this insurance" (emphasis added)); Policy [1-3] at 1, 12, 20, 21 (same). This conclusion is reinforced by the foregoing

breach of warranty provisions' use of the term "void" as a verb in the prepositional phrase "to void."  Policy [1-2] at 18; Policy [1-3] at 20.  Synonyms of the verb "void" include repeal, null, overturn, negate, abolish, cancel, invalidate, nullify, rescind, and rescind, which all imply that some event or action has already occurred (i.e., coverage has been triggered) but is being later undone or forfeited.[8]  *See Void*, Merriam-Webster Thesaurus*, https://www.merriam-webster.com/thesaurus/void (last visited July 13, 2023).

Brit's reliance upon *Sollek* for its position is also unpersuasive, as that case is plainly distinguishable.  *See* Rebuttal [91] at 14 (citing *Sollek*, 2012 WL 5835535, at *6).  The policy in *Sollek* was a third-party claims-made and reported professional liability policy, *see Sollek*, 2012 WL 5835535, at *1, not an occurrence policy, as the Policies are in this case.  Additionally, the Court's concern in *Sollek* was that it not "expand coverage beyond the scope of the bargain."  *Id.* at *8.  That is not the issue here because requiring Brit to show prejudice would not expand coverage beyond that bargained for; this is because any properties damaged on October 28 or 29, 2020, were damaged within the one-year Policy period, and they would have already been covered by the triggering event of the Ladner LLCs reporting them to Brit and paying the premium by the tenth day of that month.  *See* Policy [1-2] at 8; Policy [1-3] at 10; *see also* Policy [1-2] at 10 ("The Assured shall be indemnified in [sic]

---

[8] In contrast, when used as an adjective, synonyms of the word "void" include null, null and void, invalid, inoperative, nonvalid, ineffective, and nonbinding.  *See Void*, Merriam-Webster Thesaurus, https://www.merriam-webster.com/thesaurus/void (last visited July 13, 2023).  The breach of warranty provision does not employ "void" as an adjective.  *See* Policy [1-2] at 18; Policy [1-3] at 20.

respect to loss, up to the date of settlement of such loss, by reason of all covered perils resulting in direct physical loss or damage to and property described and scheduled under this policy in the Declarations which is not otherwise excluded . . . ."); Policy [1-3] at 12 (same).

In *Sollek*, the policy's term ran from April 8, 2010, to April 8, 2011, and it insured an attorney who had previously represented the plaintiff, Sollek.  Sollek did not learn of his former attorney's alleged malpractice until after the policy period had expired.  *See Sollek*, 2012 WL 5835535, at *1.  He filed a legal malpractice lawsuit against the attorney on May 31, 2011, also after the policy had expired, and on January 3, 2012, he filed a state court action seeking a declaratory judgment that his former attorney's insurer Westport Insurance Corp. owed a duty to defend and indemnify the attorney in the malpractice action.  *See id.* at *1-*2.  The attorney's conduct in representing Sollek had not come to light until after the policy period had expired, and Sollek thus never made a malpractice "claim" on the claims-made and reported policy during the policy period.  *See id.*  Thus, coverage never attached to begin with.  *See id.* at *8.

In *Sollek*, to permit the later-made claim to be covered would have wholly circumvented the purpose of the claims-made and reported policy, and would have expanded the length of the policy itself.  *See id.* at *3; *Minnesota Life Ins. Co.*, 164 So. 3d at 968.  As the Court in *Sollek* explained, the making of the claim and the timely reporting were essential for coverage, and "allowing waiver or estoppel to nullify these requirements would fundamentally change the nature of the insurer's

26

risk" and "likewise expand coverage beyond the scope of the bargain." *Sollek*, 2012 WL 5835535, at *8. The same is not necessarily true here, because it is undisputed that any losses would have *occurred* during the period the Policies were in force, between November 17, 2019, to November 17, 2020, and after coverage had been triggered for those properties reported by and listed as of the tenth day of the month, or by October 10, 2020. *See* Policy [1-2] at 8; Policy [1-3] at 10. In short, Brit's reliance upon *Sollek* is misplaced.

Brit's reliance upon Fifth Circuit cases applying Texas law similarly misses the mark. *See* Mem. [77] at 9-10 (citing *Blanco W. Properties, L.L.C. v. Arch Specialty Ins. Co.*, 773 F. App'x 795, 796 (5th Cir. 2019); *Starr Indem. & Liab. Co. v. SGS Petroleum Serv. Corp.*, 719 F.3d 700, 702-04 (5th Cir. 2013); *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 659 (5th Cir. 1999)). First, the Court must apply Mississippi law; in addition, the foregoing authorities are otherwise distinguishable.

In *Blanco West*, the commercial property policy required the insured to provide "prompt notice" of any loss or damage, but there was an endorsement that changed the policy and stated that "[i]n addition to your obligation to provide us with prompt notice of loss or damage, with respect to any claim wherein notice of the claim is reported to us more than one year after the reported date of loss or damage, this policy *shall not provide coverage for such claims*." *Blanco W. Properties, L.L.C.*, 773 F. App'x at 795 (emphasis in original). The *Blanco West* policy was clear that coverage would not attach if notice was not provided within

27

one year, and the insurer was therefore not required to demonstrate prejudice if timely notice was not given. *See id.* The Ladner LLCs' Policies contain no such clear language that no coverage would be available if notice was not given within 30 days. The Fifth Circuit's holding in *Blanco West* is distinguishable. *See id.*; Policy [1-2] at 19; Policy [1-3] at 21.

The policies in *Matador Petroleum* and *Starr Indemnity* contained an "absolute pollution exclusion clause," but in both cases, the insureds had purchased additional coverage to narrow those exclusions. *Starr Indem. & Liab. Co.*, 719 F.3d at 701; *Matador Petroleum Corp.*, 174 F.3d at 655. In *Matador Petroleum*, the purchased endorsement stated that the insurer "would not apply the pollution exclusion in the event of a 'covered pollution incident,'" which was defined, in part, as a discharge of pollutants that "[i]s reported to the [insurer] within 30 days of its beginning." *Matador Petroleum Corp.*, 174 F.3d at 655-56. The Fifth Circuit noted that the policy itself excluded pollution coverage and held that "under the plain language of the endorsement, timely reporting of the claim constituted one of the events necessary to trigger coverage." *Id.* at 660. Here, however, because coverage had already attached under the Ladner LLCs' Policies, timely reporting of the claims under the notice provisions was not required to trigger coverage. Brit's reliance upon *Matador Petroleum* is therefore unpersuasive. *See* Policy [1-2] at 19; Policy [1-3] at 21.

The same is true for *Starr Indemnity*, which relied heavily upon the holding in *Matador Petroleum*. *See Starr Indem. & Liab. Co.*, 719 F.3d at 702-03. In *Starr*

*Indemnity*, a "buy-back" provision provided that the exclusion "shall not apply . . . provided that the assured establishes" that certain conditions had been met, including that "the discharge, dispersal, release or escape was reported in writing to these underwriters within 30 days after having become known to the assured." *Id.* at 701 (emphasis removed). The Fifth Circuit held that, under the plain language of this endorsement, timely reporting of the claim was necessary to trigger coverage, and as such the insurer was justified in denying coverage based upon the late notice. *See id.* at 703. Again, the plain language of the Ladner LLCs' Policies is simply different, as timely reporting is not one of the conditions required for coverage to initially attach. *See* Policy [1-2] at 1, 10, 18, 19; Policy [1-3] at 1, 12, 20, 21.

Based upon the foregoing, the Court finds that the 30-day notice provisions in the Ladner LLCs' Policies did not operate as a condition precedent to coverage, and as such, Brit would also have to show prejudice in order to avoid coverage. *See* Policy [1-2] at 19; Policy [1-3] at 21; *Sollek*, 2012 WL 5835535, at *1; *Cap. City Ins. Co.*, 898 So. 2d at 682. While failure to comply with the 30-day notice provisions could potentially void coverage, Brit must first demonstrate that it suffered prejudice based upon lack of notice in order for there to be a forfeiture. *See Cap. City Ins. Co.*, 898 So. 2d at 682. These present fact questions as to each property, including but not limited to, when notice was actually given for each property (whether within 30 days or after), and whether Brit was prejudiced by or waived any of these late

notices.  Such inherently factual issues are not before the Court at this time.[9]

Because neither side has established that there are no genuine disputes as to any material fact and that they entitled to judgment as a matter of law as to any claim or defense, *see* Fed. R. Civ. P. 56(a), both Motions [74], [76] for Summary Judgment should be denied.

## III.  CONCLUSION

To the extent the Court has not specifically addressed any of the parties' remaining arguments, it has considered them and determined that they would not alter the result.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Plaintiff Brit UW Limited's Motion [89] to Strike the Declaration [78-1] of John Rosetti is **GRANTED**, and the Declaration [78-1] of John Rosetti is the Declaration [80-3] of John Rosetti is **STRICKEN** and will not be considered for purposes of the present summary judgment Motions [74], [76].

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Defendants D.S. Ladner Holdings, LLC and DAS Holdings LLC's Motion [74] for Partial Summary Judgment on the Issue of Notice is **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Plaintiff Brit UW Limited's Motion [76] for Summary Judgment is **DENIED**.

---

[9] Whether Brit in fact waived the notice provisions as to some, all, or none of the properties is a question for another day.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, the stay of discovery is **LIFTED**, and the parties are directed to contact the Magistrate Judge within ten (10) days to schedule a case management conference.

**SO ORDERED AND ADJUDGED**, this the 31st day of July, 2023.

_s/ Halil Suleyman Ozerden_
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE